All right, Mr. Davis. Yes, Your Honor. May it please the court, my name is Timothy Davis. I represent Mr. Jason Leon Ortiz. We found out habeas corpus based on what we thought was a violation of due process. In this particular case, Mr. Leon obtained a judicial stay from the Baltimore Immigration Court. And several minutes after that, he was actually physically deported from the United States. We filed this habeas corpus several weeks after he was actually deported. We argued that under a Ninth Circuit case, that there can be, that the in-custody requirement can be an exception for when there are, at least as far as the Sing v. Waters in the Ninth Circuit, has said that there are extreme circumstances. In that particular case, there was an interference with counsel. There used to be a regulation that stated that the counsel for someone that was gonna get deported got 72 hours notice of a deportation. The INS at that time did not do that. And he also obtained a stay and while he was in the process of being deported, and the INS was aware of the stay, however, they said that he had already boarded a plane, was on his way to his country of origin. And the Ninth Circuit in that case said, well, you could have ordered the plane to come back and you could have, even if it had flown off, you could have ordered it to come back to the gate or come back to the airport. Those things that the Ninth Circuit found were important to a violation of those two things. After that case, the government got rid of the 72 hour notice. There is no such thing anymore. And in fact, that is part and parcel of how the United States government deports people. They deport them in secret. They don't tell anybody what they're doing. They don't notify anybody and they just go ahead and deport them. In fact, not that they purposely obfuscate what they're doing, but they certainly don't tell counsel or anybody what they're doing. In this particular case, to actually adjudicate the extreme circumstances in this case, we note that the stay regulations have a requirement that I am supposed to,  the Department of Homeland Security of a stay. However, we think that rule is a violation of due process because it does not impose, the regulations do not impose any regulations on the immigration judge to inform the parties of that stay. And that's exactly what happened in this particular case. The immigration judge signed the stay and put it in an outgoing mail. I received it three days later and the Department of Homeland Security received it two days later. A simple change to the regulations, the immigration judge must promptly notify the parties of a signed stay. That would solve this problem. I have a duty to notify Department of Homeland Security, yet there's no duty on the immigration judge to notify us of a stay. So we think that's a violation of due process. Certainly if she had notified us, I think it would have been a much different outcome. The other thing that we are complaining about in this case is another aspect of the state regulations which says that a stay will lose its effectiveness once the person, the person who's a subject to this, subject to the stay has been placed on a plane and for a formal, last, what is it exactly? The normal boarding has been completed. So we believe that that is arbitrary and capricious because in this particular case, this was an ice air operations flight. It was completely controlled by the United States government. The plane originally started out in the Phoenix Mesa Airport in Arizona. It then, from four o'clock in the morning, it then flew to Alexandria, Louisiana, where it picked up my client. And then it flew to San Pedro Sula. It then returned to the United States back to the original destination, Phoenix Mesa Airport. So we believe that the regulation that says that the stay ends at the normal boarding process is arbitrary and capricious because my client was under the complete command and control of the Department of Homeland Security until he was released in his home country several hours later. So we have an issue where the timing is very tight about when the actual stay was signed by the immigration judge, when the person actually departed the gate, when they actually left the United States. And we actually asked the district court to conduct some discovery and find out exactly when that plane actually departed from Alexandria, Louisiana. The information that we got is just mainly an itinerary that said that the plane was supposed to leave at 11.10 Central Standard Time. Counsel? Yes. This is Judge Quattlebaum. If I could interrupt you just to ask a couple of questions to get something straight. In this case, you've filed in the district court a habeas, a seeking jurisdiction under the habeas statute. Yes, sir. And I'm trying to make sure I understand the available remedies, what remedies you might have for this situation. And so one, I think I'm right that you have that you don't think is adequate and didn't pursue would have been to appeal to the BIA and then petition our court. Of course, that would have been after the deportation. So I understand your concerns about that. But in theory, that's one remedy that you would have had or your client would have had. Is that correct? No, Your Honor. The Board of Immigration Appeals has absolutely no power to force the government to return Mr. Leon Ortiz to the United States. That's why I sought habeas corpus review because only the federal court has that power. Well, and so, I mean, I think that's fair, but, and this isn't central to anything, I'm just, would you contend that we wouldn't have that power if you had appealed and then petitioned us for review? But what would I appeal, Your Honor? I mean, maybe I'm, look, I'm not trying to make it. No, no, no, Your Honor, that's a good question because I'm not sure that I can get that. I would have thought you could have made the same arguments that the deportation violated the stay and pushed that with the BIA and then challenged those with us. And I'm not saying it's a waiver or anything. I just didn't know if you thought that was a remedy, albeit one you didn't think made sense given your client's predicament. We did appeal the case to the Board of Immigration Appeals, Your Honor. Let me get to my second one. I should have just gone straight here because in your complaint, you have a count for violation of the APA. Yes, Your Honor. That was the, so the due process violation was the requirement that I have to notify DHS of the stay where the immigration judge has no duty to notify me of the stay or DHS. I think that's clearly a violation of the process. But anyway, for the APA, it's the arbitrary and capricious nature of the, when does the stay end? Here, the regulations state that the stay ends when a normal boarding process has completed. I believe that that is a very outdated concept of the deportation process. That was promulgated in 1997, actually in response to the Singley Waters when the INS would take people down to the airport on a commercial flight. There may be. So do you have, did, just in the way you pled this, did you, you have an APA claim, you know, the basis for federal jurisdiction that you assert is the habeas claim or is the habeas statute. Do you claim jurisdiction in federal court under basic federal question law, separate and apart from the habeas statute? No, well, no, Your Honor. I think if I had, if I had pled the case as like a mandamus or an APA suit, I think I would, I would have, I would say that's true. In this particular case, I used habeas to get to those claims. And that, I guess that's my question. If we, if we do not, if there is not an extreme circumstances exception to habeas, do you have the ability here to pursue your APA claim separate? I'd have to go back and replete it, go back and replete it to the district court. Of course, we've held that the APA doesn't apply to immigration matters following a Supreme Court case. You have to face that issue. That's not before us here because we're really focusing, I think, on the habeas jurisdiction. That's news to me, Your Honor, because the APA has been used in immigration cases. I mean, not in deportation proceedings, but in other aspects of the case. In this particular case, these are not necessarily issues of the deportation case. There are issues of here's a stay and we were arguing that it was violated by the government. Those are not normal issues of deportation. They're not the deportation issues. But as far as I believe that they would apply in this particular case, when you're talking about government action on their own regulations and the statutes for the state regulations, I believe that they would apply to that application. The habeas jurisdiction is plainly based on Singh B. Waters exceptional circumstances. And we also say that the exceptional circumstances to evaluate that, this court needs to look at the stay regulations and the fact that they are violation. Let me ask you about the Singh case. In the Singh case, the INS had notice of the stay and there was an interaction there. They sort of kept taking the person on the plane because I guess they were so close to deportation, they just did it. But there was sort of a contumaciousness by the government that was being addressed by the court and a little heavy handedness. In this case, neither you nor the government knew of the stay for several days. And so the whole deportation process was conducted under sort of innocent circumstances. Indeed, the immigration judge found that there was no violation of the order in this case. That is correct, Your Honor. She did. However, I would assert that as I go back to this requirement, the immigration judge has, and these are regulations that are promulgated by the Department of Homeland Security. So these are regulations that may or may not be subject, they may be violative of due process. They don't care. That's why it's up to this court to say, hey, this rule that says I got to notify the Department of Homeland Security and the immigration judge doesn't have any rule to tell anybody. I mean, and it's not her fault. She didn't have a requirement to tell the parties. That would have solved everything. Just timely notify the parties of a stay. I think that would have been a very, very reasonable regulation to impose. They do have to take all reasonable steps to comply with the state granted by an immigration judge. That's the rule. That's in the regulation. They put that in there. So I'm trying to figure out why they're not doing that. Why are they not implementing a rule where the immigration judge timely notifies the parties of a stay? It seems pretty important. She's put it in her outgoing mail. I mean, and, you know, there's a lot of things in this case that are kind of crazy. April 1st last year, I mean, it was a pretty crazy time. I mean, courts were closing. I thought the immigration judge did notify both parties. She did. She put the notice in her outgoing mail. Yeah, but isn't that notice to the parties? It is under the current regulations. We're saying that's a violation of due process. I mean, this is an important order from an immigration judge. And she has no duty to notify the parties. I mean, timely notify them, make a phone call, do something. I mean, this is not electronic filing in all the immigration courts yet. So nobody, you know, there was no electronic filing. Maybe one day that'll be solved and we don't have to worry about things like that. But she just put it in her outgoing mail. And there was no notice to the parties. I put, I had an affidavit. And so I forget where it is in the actual joint appendix, but I actually tried to call the court. I was told no stay had been granted. So... I thought that you were told at one, between one and two o'clock on that day that the matter was still pending before the judge. Yes. Well, that didn't say no stay had been granted. That says it's pending before the judge and suggests that. I mean, we know it was entered on that day. We just don't know the particular moment. An immigration judge noted later that it was moments after 1108 when you filed. But moments is a plural word that could mean anytime. But you called it between one and two and the stay had not yet been entered according to the clerk there. Yes. The court is closed from 1130 to 1230. And so I called as soon as I could. It was just a crazy time. I normally would, all my filings are done in person. I would have filed in person. This particular case, I emailed the court clerk at 1030. And then I had no way to file anything with DHS. They had just implemented a electronic service. I applied for it that day, but I was not approved till the next day. By that time I'd already filed the service by mail. So it was just, it was a very unfortunate circumstances that that all occurred the way it did. However, I still get back to the fact that, you know, there was no duty of the immigration judge to notify the parties. And it was a pretty important thing. I mean, especially in this case where he was on a plane getting, you know, going to be deported. I'm over my time, Your Honor. All right. Thank you, Mr. Davis. Ms. Grant. Good morning, Your Honors. May it please the court. Nicole Grant on behalf of the government. The district court did not err in dismissing Mr. Ortiz's petition for rid of habeas corpus after determining that it lacked jurisdiction to hear his claims. The district court probably found that there existed two separate distinct concrete bases through which it was stripped of its jurisdiction. First, Mr. Ortiz filed a petition for a writ of habeas corpus. The habeas statutes require those found at 28 U.S.C. 2241 that anyone seeking habeas corpus relief must be, quote, in custody, quote, at the time in which they filed their petition. The record before this court is clear. And Mr. Ortiz does not disagree that he was not in custody at the time that he filed his habeas petition. Mr. Ortiz argues that exceptional circumstances exist, but they do not. Secondly, the district court did not err in determining that alternatively. Counsel, could I stop you? I just want to make sure that first point, I understand what you're saying. Are you saying that we, that an exceptional circumstances, that extreme circumstances exception doesn't exist or that the facts here do not satisfy such an exception? Thank you for your question, Your Honor. I'm arguing that the facts here do not satisfy a finding of exceptional circumstances. Same does make the carve out for exceptional circumstances where individuals who have been removed, where there's a valid state order in place, you know, can be deemed to not have to comply with the in custody requirement. But in this case, there was no valid state order at the time in which Mr. Ortiz was removed from the United States. Thus, exceptional circumstances do not exist in this case. Yes, seeing certainly does do that. But, you know, we haven't done it and the Supreme Court hasn't done it, but I take it your position is you're not contesting that exception. It is part of the habeas analysis. You just don't think it's met here? Yes, Your Honor. The government doesn't have any position on, you know, what this court's view should be on exceptional circumstances existing. We acknowledge that, you know, the Ninth Circuit has found in that case that they do exist. The government's position is the facts. In this case, before this court, they do not satisfy an exceptional circumstances finding should this court decide to rely on seeing and accept exceptional circumstances as a basis to sidestep the in-custody requirement. What's your position? I explored a little bit with your colleague about whether an APA claim could be brought, whether or not it's done here, could be brought separate and apart from the habeas statute. You know, not on the basis that this isn't really challenging the discretionary deportation decision. This is more of a legal attack on the regulations. And in answering that, would you consider the Supreme Court's Jennings case? Well, in this case, Your Honor, the government's position would be that Mr. Ortiz's APA claim cannot proceed for multiple reasons. One, before the court was a petition for habeas corpus, Mr. Ortiz was not in custody. Therefore, the court could not exercise jurisdiction on that basis. The APA does not provide its own independent basis for jurisdiction. Therefore, there would have had to be some other basis for jurisdiction for Mr. Ortiz's habeas, for his, sorry, APA claim to proceed. If someone just, if this claim had not been brought as a habeas claim, isn't the APA a federal question jurisdiction? And are you saying that's not an independent, that you couldn't claim federal question jurisdiction under the APA? Now, I know there's a question about whether we have jurisdiction or not, but isn't that a valid federal question? Well, Mr. Ortiz wouldn't have filed a complaint, you know. Fair enough. I know that wasn't done here. I'm talking about in theory. Well, in theory, he could have challenged, in theory, you can file an APA claim in an immigration case. However, in this one, he is challenging, you know, what 1252G, we would argue, would not allow him to challenge before courts, which is ICE's ability to effectuate a removal order. And so the governor's position would be that, no, he would not be able to challenge, you know, he would not be able to bring that challenge before the court. How does that square? Does that answer your question? It does. And how does Jennings apply or not apply to that position? Well, Jennings stands for the proposition that there are limitations on, you know, what can be brought before the court. Well, it stands for the proposition, I thought, that that is the case, but the general jurisdiction bar applies to discretionary decisions, not legal challenges to the regulatory or a statutory framework. But the government would argue that, you know, Mr. Ortiz's claims are challenging his removal order, ICE's ability to carry out that removal order, which is, in fact, a discretionary decision that ICE, you know, has the ability to make. And thus, Jennings would not allow him to bring that challenge. Okay, thank you. Mrs. Grant, your position that the extreme circumstances are not met here because he did not simultaneously file a habeas at the time or what? Well, yes and no, Your Honor. So as a threshold matter, the government argues that extreme circumstances do not exist here because Mr. Ortiz, because there were many opportunities for Mr. Ortiz to have filed his motion per se. He waited until the very morning to file it. He could have filed it on March 10th when he was initially placed into immigration proceedings. He could have filed it on March 20th when he was interviewing with the consulate to get his travel documents. He could have filed it on March 30th when he was transferred to Louisiana, as he stated, to a federal consulate to effectuate his removal. He did not. He waited until the very morning to file his motion per se. The regulations controlling motions per se are clear, Your Honors. Those found at 8 CFR 12 or 241.6C. Sorry, Your Honors. Yes, the government has to take all reasonable steps to comply with the valid state order, but there was no valid state order in this case because as the regulations go on to say further, the order only becomes valid if it is signed prior to Mr. Ortiz having boarded the plane and normal boarding having completed, or more importantly in this case, if it had been communicated to the agency so that they could take some action. Extreme circumstances existed in Sing because as Judge Niemeyer mentioned, you know, DHS was aware in that case that a state order had been issued and they acted in contravention of that state order. In this case, Mr. Ortiz does not deny that the government was not aware of the state order until two days later. Further, the government would argue that any exigency that existed in this case was actually created by Mr. Ortiz because he waited until the very morning of his removal to file the motion per se. But that's true. But your point of best practices is well taken. But when we talk about, in a sense of jurisdictional aspect of the order existing, we look a little question there is whether or not, notwithstanding him being late, the question is, at the time that the order was entered, a stay, he was in the United States, was he not? No, Your Honor. The facts do not show that at the time the stay was entered, he was in the United States as Mr. Davis stated in his declaration. The understanding was that, you know, it was signed some moments after he filed it, as Judge Gittmeier... Where was he? I mean, it's not a trick question. I mean, whenever it was, when it was filed, where was he? When the motion was filed before the court, yes, he was in the United States because the record shows that it was filed at 11 or 8 a.m. However, the filing of the motion to stay is not what, you know, puts the duty on the government to, you know, comply with the motion to stay. Not just the filing, but when the order was signed or entered, was he in the United States? That is unclear, Your Honor. It's unclear whether or not he was physically in the United States at the time that the order was signed. But assuming, arguendo, he was, let's assume that the order was filed at 11 or 9, he still would not comply with the regulations because the regulations require that it not only be signed, but communicated to the agency prior to him boarding and, you know, normal boarding having concluded for it to be a valid stay. So here we have a stay that was filed moments before the flight took off. Right. That may be the, that may be the, this normal boarding, whatever that means, but in terms of the habeas talks about in custody. So for that, you could still be in custody in the United States, but still under your rules, you're here, but the normal boarding proceedings have concluded, right? Well, Your Honor, the in-custody language does not attach to the regulations controlling stay. The in-custody requirement is a habeas requirement and he must be in custody at the time that he filed the habeas petition. He was not in custody at the time that he filed the habeas petition. The government lawfully removed him on April 1st, 2020. He did not file his habeas petition until May 12th, 2020. That is why he does not satisfy the in-custody requirement. But as it pertains to the stay order, the stay order was invalid because it was not communicated to the agency prior to. Exactly. Well, no, this is a case where nobody's at fault. The question is, is it extreme because of the circumstances he didn't have a chance to fully vet through the process the change of status that he was seeking? Because of not, as you say, not the fault of the government, you know, ICE didn't know. And someone put it in the mail, as Counselor Wells says, that's very important stuff to put that in the mail. It's like somebody's, you know, dying or pausing. You say, okay, good. I got the antidote, but I'm going to mail it to you. I mean, you got to get it to them. But it's no one's fault. But doesn't it make it extreme in a sense that we're talking about a person's life and these things are important. And why wouldn't that be extreme? Does it have to be someone's fault to be extreme? No, Your Honor. It certainly does not have to be someone's fault to be extreme. And the government acknowledges that, you know, the circumstances they played out here are unfortunate. However, the regulation is clear. And in this case, the state order just never became valid because it did not comply with the regulations. The government was not aware of this. The government not being aware of the state order when Mr. Ortiz was removed, you know, is a secondary issue. The primary issue being that in order for the state order to have been valid, it had to have been communicated to the agency prior to him boarding the flight and prior to normal boarding concluding. And that is not what happened here. Moreover, you know, as unfortunate as it was, Mr. Ortiz is not foreclosed from, you know, challenging his removal. You know, the second basis that the court found that electrorestriction, the Real ID Act, the 1252A5 and B9, you know, that states that any claim arising out of removal-related activity should be brought before this court through a petition for review after determination by a Board of Immigration Appeals. And the government, you know, is aware that Mr. Ortiz is still carrying out actions  He has since filed an appeal of the IJ's decision to dismiss his case. You know, that went up to the Board and the Board remanded and it was before the IJ again, the IJ issued a second decision that he has now appealed again. And, you know, depending on how that decision, you know, plays out, it could be that the BIA decides to reopen on its own or the BIA could deny the motion and Mr. Ortiz could follow the proper steps and file a petition for review before this court and make all the arguments that he's tried to make in a habeas petition where the court just could not exercise the jurisdiction. Or perhaps the United States government might join in not opposing that motion to reopen for the BIA, correct? Your Honor, I speak for... I mean, you represent the United States government, the government position that situations like that, and you said it very well, very unfortunate situation. Would this might perhaps be the case where the government would do that? Your Honor, I cannot speak for what, you know, ICE will do. You know, they're a completely separate agency with their own, you know, decision-making processes. But, you know, I do know for the court, while this was unfortunate in terms of how things turned out that particular day, this was not unfortunate in terms of how Mr. Ortiz laid in seeking relief before the immigration court. Mr. Ortiz entered the United States in 2013, and his removal order became final in 2015 when he did not appear for his removal proceedings. So we're talking about from 2015 to 2020 where he could have filed a motion to reopen his proceedings to, you know, seek some relief from removal. He did not file anything for five years and waited until April 1st, the morning of his removal to file both a motion to reopen and a motion to stay his proceedings. I mean, to stay his removal. You know, so there were many opportunities in that five-year period for Mr. Ortiz to seek the relief that he wanted before the immigration court in terms of, you know, relief from removal. But moreover, there were many opportunities while Mr. Ortiz was still in government custody for him to have filed his habeas petition, and he did not. He was transferred into immigration detention on March 10th. From March 10th to March 30th, he knew that he was going to be removed. And he chose not to file a motion to stay his removal until April 1st, two minutes before his flight took off. And so, yes, the government does agree that the facts of this case in terms of what happened on April 1st are unfortunate. But as the government has stated before, the exigency that was created in this case, not only that day, but, you know, going back to 2015 when his removal order became final, these were actions or inactions, I should say, taken by Mr. Ortiz himself. Counsel, what's your, I know you have two independent bases for saying there's no jurisdiction to consider the merits of the issue. So I'm not, by asking this, you know, suggesting you're not right or that you are right on that. But, you know, Mr. Davis talks about, you know, you have a regulation that is based on boarding a plane. It seems to be, or at least is asserted to be, based on a historical way of deportation through commercial airlines. Is it not unreasonable to use procedures that applied to a deportation method that doesn't even exist anymore as the basis of determining whether an order of stay is effective or not? The government's position would be no, only because what is important in that scenario is DHS being notified that an order of stay has been granted. And so whether the flight is one that is commercial, or one that is, you know, controlled by ICE, unless ICE is aware, there can be no steps taken to... But the notice, Dutton Council, that it's not just notice or communication, it's communication before boarding, if I recall. Maybe I'm wrong on that. And so the boarding matters. I mean, by the time he's here, it may not matter as much because the notice happened, was received two days later. But, I mean, there could be facts that are different than these. So I'm trying to get to the merits of basing communication, basing notice before boarding, which seems like saying notification by facsimile or some method that's just not used anymore. And if that's the case, is that not unreasonable, assuming there's jurisdiction to get there? Um, Your Honor, I'm not comfortable taking a position on whether or not, you know, that is reasonable. The regulations are as they are. You know, in terms of, you know, reasonableness in this case, the government's position is that, you know, the state order was not ever valid because of how the facts played out here. Um, but in terms of, you know, the question of reasonableness, I'm just wondering, thinking along with that question, it seems to me the question of reasonable, reasonableness about the regulation, the unreasonableness would depend on whether the government was manipulating the time. And it seems to me the only way it could be manipulating the time is if it knew there was a stay order coming or was there. In this case, and in that case, that might be exceptional because in the Singh case, the government was aware and the order was a valid order. And in this case, the order was not a valid order under the regulation and the government wasn't aware of it. And so it seems to me the regulation would be measured by the same notion. If the government knew of the stay order and started manipulating the departure, obviously, there's a problem there, but it also would be ignoring the stay order as opposed to following the regulation at that point. Court's indulgence, I see that my time has expired. Is it OK if I respond to Judge Nehemiah and conclude? Yes, you may. I agree completely with you, Judge Nehemiah. There was no claim that the government was or has manipulated its departure times to invalidate orders of stay. Mr. Davis and Mr. Ortiz were provided with the flight departure manifest that showed when the flight took off and when the flight landed. There were no allegations that that was in any way doctored. I would argue that there would be no reason for the government to doctor these documents because if there is a valid stay, the government does want to comply with the regulations and to ensure that it is acting to not violate the law. And so in a circumstance where a stay is valid and that is communicated to the agency prior to the flight boarding, I would argue that the government is going to follow the regulations and take reasonable steps to comply with that stay order. If there are no further questions, the government asks that this court affirm the district court's decision below. Thank you so much. Thank you so much, Ms. Grant. Mr. Davis, you have some time reserved. Yes, Your Honor. What I would say is, first, we're not alleging any type of manipulation by the government. However, as we tried to do, we tried to get discovery on when that plane actually boarded and when that plane actually departed from that airport, and we were not able to get that. The judge shut us down because that document on page 84, I believe it's 84 of the joint appendix, is just an itinerary. It shows when the flight was supposed to take off or depart. We actually don't know that because it's just an itinerary. That flight could have actually left early or it could have left a half hour late. We actually don't know that. And that was something that we tried to ask the... We tried to get discovery on the government on exactly when that occurred. But we're still not arguing that the government did anything, you know, manipulative here or did something that was... that they ignored a stay or anything like that. We're simply arguing that the stay regulations are unfair. They are unfair to respondents like my client who did get a judicial stay. And it seems like they could, and I think government, the most powerful government on the world, if they wanted to do something, they could do it. They could have called down to that plane. They said, you know what? We got to stay. The judge just let us know we got to stay. It just got signed, get them off the plane. Or even if he landed in Honduras two hours later, that still could have... There's nothing that the government is going to tell me that they don't have the power to tell that flight to bring that guy back. So I do believe that there's nothing that the government did untoward here. But by not imposing or those are not promulgating regulations and make the IJ, you know, let us know about these stays as soon as possible. I think that was the linchpin of the case. And as I said before, I think it's the regulation as the government is standing on, it's very unfair talking about a boarding process. There was a boarding process in Phoenix, Arizona. There was a boarding process in Louisiana. Are they saying that somebody that did a boarding process in Mesa, he can't, he gets to Alexandria, he can't assert a stay. That's preposterous. It's based on, you know, 25 years old processes in the commercial airline industry. And it needs to be changed. So the other thing too is, your honor, I will tell you, I filed that motion as soon as I possibly could. There's no way that you can just file a motion to reopen and just, you know, just throw it in there. It has to be, I've been doing this business for a long time and you have to have those motions. They have to be perfect. In this particular case, we had to come up with an asylum claim. My client, we were waiting on documents from outside the country and my client was detained. We did the best we could, you know, with all these COVID problems going on. I filed that motion as soon as I possibly could. There was absolutely no waiting around whatsoever. I knew the clock was ticking. I told my client to call me if they changed his custody. He did. We knew we were on the clock and we got in there as soon as we could. It just happened to be that it just, you know, it was, as I said, it was a crazy time. April 1st, you know, the COVID was going on. It was nuts. The courts were closing instead of just going down to the court and filing it, which is what I normally do. I had to email it. I emailed it at 1030 in the morning. It finally got to the judge at 1108. It's just all, it wasn't anything that, um, anything that I was sitting on anything. I filed that as soon as I possibly humanly could. So I, I, I don't like the fact that anybody's asserting that I, I, I linger and malingered or did something, uh, that in any way harmed my client. Cause I know from years and years of experience of dealing with detained people, you're always on the clock. You've got to get those motions in there and you've got to file them as soon as possible. Um, so, um, if there are no further questions, your honor, I hope that you will reverse the decision of the, of the, um, of the, uh, district court who plainly said the fourth circuit has never said anything about this, uh, exceptional circumstances. And I hope you do find that, uh, Oh, and one other thing, your honor, I do want to say that the, there are just circumstances. I mean, and I don't know that I can actually take this back up to fourth circuit based on what happened in the immigration court. Immigration court did not conduct an evidentiary hearing. She just based it on facts that she knew at that time. I have a feeling. So that's why I filed the habeas because I wanted all the facts of this, this very close timing to be adjudicated in that court so that the, so the issue would be completely preserved for the, for the court, all the facts. Um, no further questions. All right. Thank you, Mr. Davis and Ms. Grant. Thank you. Appreciate your, your, your fine arguments. And, uh, well, we couldn't come down and greet you anyway, because you're somewhere in cyber space, but I understand that the sentiments are there and the appreciation certainly is as well. And I wish you both be safe and stay well. Thank you so much.
judges: Roger L. Gregory, Paul V. Niemeyer, A. Marvin Quattlebaum Jr.